UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
FRANK VENTIMIGLIA,

                Plaintiff,

     -against-

HUSTEDT CHEVROLET, HUSTEDT CHEVROLET,
INC., HUSTEDT HYUNDAI,  HUSTEDT HYUNDAI,
INC., and CHARLES CHALOM, individually
and in his capacities as owner and/or agent of
Hustedt Chevrolet, Hustedt Chevrolet, Inc.,
Hustedt Hyundai, and Hustedt Hyundai, Inc.,
and JOHN DOES 1-20

                Defendants.
-----------------------------------------------------------------X

**MEMORANDUM & ORDER**

Civil Action No. 05-4149
(DRH) (MLO)

**APPEARANCES:**

**Steinberg, Fineo, Berger & Fischoff, P.C.**
Attorneys for Plaintiff
401 Broadhollow Road, 4th Floor
Melville, New York 11746
By:    Sharon D. Simon, Esq.

**Milman Labuda Law Group, PLLC**
Attorneys for Defendants
3000 Marcus Avenue, Suite 3003
Lake Success, New York 11042
By:    Perry S.  Heidecker, Esq.
       Michael J. Mauro, Esq.

**HURLEY, Senior District Judge:**

      This action is one of several pending before this Court in which a former employee of

Defendants Hustedt Chevrolet, Hustedt Chevrolet Inc. ("Chevrolet Inc."), Hustedt Hyundai,

and/or Hustedt Hyundai, Inc. (collectively "Dealership Defendants") is seeking redress for the

alleged discriminatory and retaliatory practices of Defendant Charles Chalom ("Chalom"),[1] owner of Dealership Defendants, and hostile work environment created by him.  In the instant case, Plaintiff Frank Ventimiglia ("Plaintiff" or "Ventimiglia")  asserts the following claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the New York Executive Law § 296: (1) hostile work environment based on his national origin, Italian; (2) hostile work environment based sex; (3) hostile work environment based on race; and (4) retaliation for opposing Chalom's sexual harassment of Caronia.  In addition, Ventimiglia asserts common law tort claims, including one for defamation.  Presently before the Court is Defendants' motion for summary judgment on the Title VII claims, the New York State Executive Law claims, and the defamation claim.  For the reasons set forth below, the motion is granted in part and denied in part.

### Background

Dealership Defendants are engaged in the sale and lease of cars and trucks.  Ventimiglia was employed by Chevrolet Inc. as the general sales manager from approximately May 2004 to October 4, 2004.  His average earnings per month were approximately $30,000.00.  Chalom owns 100% of the stock of Chevrolet Inc.[2] and was Ventimiglia's supervisor.   Chalom has the final decision-making authority for the Dealership Defendants.

Josephine Caronia ("Caronia") was also employed by Chevrolet Inc. and held the position of Controller.  Other co-workers of Plaintiff and Caronia were Kevin Pratt ("Pratt"), Andrew

---

[1]  Dealership Defendants and Chalom shall be collectively referred to as Defendants.

[2]  It is also uncontested that Chalom owns 100% of the stock of defendant Hustedt Hyundai Inc.

Levy ("Levy") and Paul Weiss ("Weiss").  Caronia, Weiss, Pratt and Levy all commenced

actions against Defendants alleging discrimination.[3]   It is alleged that "Chalom was given to

constant outbursts of unlawful and inappropriate epithets against different racial and ethnic

groups."  (Pl.'s Mem. in Opp. at 6.)

Ventimiglia claims he was subject to a hostile work environment as a result of his Italian

heritage.  At his deposition, he testified that Chalom would call him "guinea" and "goomba," and

he heard numerous Italian references and slurs that Chalom directed at Caronia.  One incident

recounted by Ventimiglia occurred when in front of the office staff Chalom grabbed his arm,

threatened to "kick his f---ing ass" and said that he was the only "guinea" Chalom had ever met

with no honor.  At her deposition, Caronia testified to an incident in Chalom's office when

Chalom grabbed Ventimiglia by the throat and said that Plaintiff was the "first guinea he ever

met with no balls."  The parties dispute whether these are two different instances or different

versions of the same instance.

Ventimiglia also claims he was subjected to a hostile work environment based on sex.

According to Plaintiff, Chalom was obsessed with Caronia and continually demanded she engage

in a relationship with him.  Caronia refused these requests and when she did so, Chalom did not

react well.  For example, he accused her of having sex with other men at the dealership including

Ventimiglia.  He would accuse and "interrogate" Ventimiglia about having a sexual relationship

with Caronia.  (Ventimiglia Aff. at ¶9.)  Despite Ventimiglia's denials, Chalom's accusations

did not stop.  According to Ventimiglia, he was "placed in the middle of [Chalom's] harassment

---

[3] Although these actions are also before this Court, the actions have not been
consolidated.  Each of the five actions remain separate. Accordingly, the instant motion for
summary judgment will be decided solely on the record in this case.

of Caronia by [Chalom's] constantly accusing [Ventimiglia] of having an affair with her and forcing [him] to defend [him]self against these ridiculous accusations. (*Id.* at ¶ 19.) Ventimiglia also witnessed Chalom calling Caronia offensive names like whore, making lecherous remarks about her body, and actually grabbing her and touching various areas of her body while she struggled to get free. (*Id.* at ¶¶11-12.) According to Ventimiglia, Chalom's remarks were not limited to Caronia; he made lecherous and inappropriate remarks about other female employees, such as talking about their "tits," as well as Plaintiff's wife and women who came into the dealership. (*Id.* at ¶¶18, 20.)

Ventimiglia avers that he told "Chalom that his remarks, accusations and behaviors were offensive" but Chalom said "he could do whatever he wanted to do." (*Id.* at ¶21.) He testified that in 2004 he spoke to Chalom about his treatment of Caronia more than a dozen times. (Ventimiglia Dep. at 74.) In addition, he told Chalom not to make remarks about other women, both employees and customers.

Defendants dispute that Ventimiglia "opposed" any discrimination, pointing to Ventimiglia's deposition testimony concerning a sexual harassment training seminar held by the Dealership sometime in 2004. Ventimiglia testified that he questioned Chalom about the seminar because he had concerns about the training and the damaging and incriminating information about Chalom and the dealership that was being discussed at the seminar. Ventimiglia further testified that at the seminar Caronia was asking questions that he thought were putting Chalom in a very bad light and asked Chalom "Do we need to continue this training? She's burning you in these meeting in front of everybody that works for us." (Ventimiglia Dep. at 132.) According to Ventimiglia's deposition testimony he was "concerned with what was happening and [he] was in

a room full of employees and [he] was considered to be a supervisor and she [Caronia] was just airing stuff that was more incriminating than helping and [he] couldn't see the logic.  From the standpoint of protecting the company it was terrible what was happening in the room, and there was way too may witnesses for the conversation to be taking place, and I was directed to continue."  (*Id.* at 134.)

According to Chalom, in October 2004 he decided to place one Patrick Maguire in the position of co-general sales manager with Plaintiff to address a deficiency in Plaintiff's performance.  Chalom asserts that Ventimiglia would as a matter of course approve sale prices that failed to include lucrative "after sale" items, like a car alarm or an extended warranty, leaving it to the finance department to then "pump" the customer on the established price. Ventimiglia denies any deficiencies in his performance and asserts that the dealership's finances improved as a result of his efforts. Ventimiglia claims Chalom first fired him and then later gave him the option of coming back at one-third his prior compensation.  Ventimiglia asserts that his position was taken away as a result of his constantly imploring Chalom to stop harassing Caronia. (Ventimiglia Dep. at 236.)

Scant information is provided as to Ventimiglia's claim of hostile work environment due to race.  Ventimiglia asserts that "Chalom made insulting references to African Americans. I had hired Kevin Pratt, an African American salesman, and Chalom asked me who the schvartze was. My understanding of that word is that it is derogatory reference . . . ."  (Ventimiglia Aff. at ¶ 28.) Ventimiglia also asserts that Chalom regarded him as associated with Pratt, an African American: "Chalom referred to the fact that Ventimiglia hired Pratt, and accused Pratt of loyalty to Ventimiglia.  Chalom stated of Pratt, 'I know he's going to lie on behalf of Ventimiglia.

Ventimiglia got his number.' . . . Chalom further testified that Pratt was 'intimidated' between [Chalom] and Ventimiglia, and further testified that he [Pratt] should stop being a friend to Ventimiglia." (Pl.'s Response to Def.'s 56.1 Statement at ¶ 83 (brackets in original) (citing Chalom Dep. at 102-03, 213).)

Additional factual information shall be discussed to the extent relevant to the issues at hand.

*Discussion*

**I. Summary Judgment Standard**

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates both the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *See Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that

show that there *is* a genuine issue of material fact to be tried. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Cons. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted). Affidavits submitted in opposition to summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show that the affiant is "competent to testify to the matters stated therein." *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir. 2004) (citing Fed. R. Civ. P. 56(e)). "Rule 56(e)'s requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavit also means that an affidavit's hearsay assertions that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial." *Patterson*, 375 F.3d at 219 (citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999)).

When determining whether a genuinely disputed factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability," or "the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 254-55. A district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties

will bear at trial guide the district court in its determination of a summary judgment motion. *See Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *See id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "'persuasive evidence that [her] claim is not 'implausible.'"" *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

In deciding a summary judgment motion, a court must resolve all factual ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987). That being said, it is well-established that a non-movant cannot defeat summary judgment with nothing more than "unsupported assertions," *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995), or the allegations in its pleadings. *See Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996); *see also* Fed. R. Civ. P. 56(e). More particularly, although "summary judgment should be used sparingly" in cases where the material fact at issue is the defendant's intent or motivation, the plaintiff must nevertheless offer some "concrete evidence" in his favor, and is "not entitled to a trial simply because the determinative issue focuses upon the defendant's state of mind." *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988). "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

8

## II. Hostile Work Environment

### A. The Standard

"Title VII creates a cause of action based on the presence of a hostile working environment when the workplace is 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of the victim's employment. . . .'" *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999) (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993)).

To establish a hostile work environment claim, a plaintiff must prove "[1] that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and [2] that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)). The plaintiff must "show that the complained of conduct: (1) 'is objectively severe or pervasive - that is, creates an environment that a reasonable person would find hostile or abusive'; (2) creates an environment 'that the plaintiff subjectively perceives as hostile or abusive'; and (3) 'creates such an environment because of the plaintiff's sex [or color or race or religion or national origin].'" *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (ellipses in original omitted) (quoting *Gregory v. Daly*, 243 F.3d 687, 691-92 (2d Cir. 2001)). In other words, the plaintiff "must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [his/]her employment were thereby altered." *Alfano*, 294 F.3d at 373 (internal citations omitted).

"This test has objective and subjective elements: the misconduct shown must be 'severe

or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Id.* at 374 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). In analyzing a plaintiff's case, "courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." *Id.* (citing *Harris*, 510 U.S. at 23). Relevant factors include "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris*, 510 U.S. at 23). "But it is well settled in this Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Alfano*, 294 F.3d at 374 (citing *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) and *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999)).

"Because the crucial inquiry focuses on the nature of the workplace environment as a whole, a plaintiff who [him]self experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support [his] claim." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000). "Nor must offensive remarks or behavior be directed at individuals who are members of the plaintiff's own protected class. Remarks targeting members of other minorities, for example, may contribute to the overall hostility of the working environment for a minority employee." *Id.*

Finally, it is axiomatic that in order to establish a hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of his membership in a protected class. In other words, an environment which is equally harsh for both men and women

or for both young and old does not constitute a hostile working environment under the civil rights statutes." *See Brennan,* 192 F.3d at 318.[4] *See also Alfano,* 294 F.3d at 374 ("in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex").

Ventimiglia has raised three hostile work environment claims. They are (1) hostile work environment based on his national origin, to wit: Italian; (2) a hostile work environment based on sex; and (3) a hostile work environment based on race. Defendants' have moved to dismiss these claims arguing (1) Ventimiglia has failed to adduce facts to support his claim of a hostile work environment based on his national origin, and (2) Ventimiglia does not have standing to pursue hostile work environment claims based on discrimination against others who belong to a protected class of which the he is not a member. The Court shall first address Plaintiff's hostile work environment claim based on his own national origin.

### B. Plaintiff's National Origin Discrimination Claim

Defendants' motion for summary judgment on Plaintiff's hostile work environment claim based on his own national origin is premised on three arguments. First, Plaintiff was not subjected to severe and pervasive anti-Italian comments. Second, Plaintiff's terms and conditions were not affected by any of the alleged comments. Third, Plaintiff cannot support his claim of a hostile work environment based on his national origin by reference to alleged comments made against other employees who are member of a class to which Plaintiff does not belong.

---

[4] Hostile environment claims are governed by the same standards under Title VII and the NYSHRL. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir. 1998).

According to Defendants, Plaintiff identified only two specific instances of Chalom making derogatory comments that could be construed as being based on Plaintiff's Italian ancestry.   One instance occurred when Plaintiff was walking with Chalom and Caronia and according to Plaintiff  "he yelled at me that I was the only guinea that he ever met with no honor, and he physically grabbed me by my front arm in front of [Caronia], got into my face and told me he wasn't afraid of me because I was younger than him and that he would 'kick my fucking ass.'" (Ventimiglia Dep. at 143-44.)

Plaintiff points out, however, that he testified as follows:

Q:      What kind of names did he call you, sir?
A:      Goumba, that I was the only 'ginny' he ever met with no honor, those type of things.
Q:      When did that occur, sir?
A:      2004
. . .
Q:      How many times did that occur, the name calling?
A:      It was constant behavior.
Q:      When Mr. Chalom would direct these words to you what, if anything, would you do, sir?
        . . . [objection]
A:      I had different responses at different times, I would object, I would not say anything, I tried everything to get him to stop.

(Ventimiglia Dep. at 248.)  Plaintiff also directs attention to the fact that he testified that he was present when Chalom made Italian references and slurs directed at Caronia based on her Italian heritage.  (*See id.* at 82-84.)   Ventimiglia is unable to identify any physical symptoms caused by his experience at the dealership, and reports that he never sought professional treatment for the psychological and emotional damages he believed he suffered.   He maintains that he has "still not completely recovered from all that happened . . . while working at Hustedt. . . .[T]his terrible experience has stayed with [him] for a long time, it has affected [his] relationships with people, .

. . [he is] not as trusting as he used to be . . . and periodically still experience[s] nightmares. (Ventimiglia Aff. ¶38.)

Viewing the record as a whole, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," *Alfani*, 294 F.3d at 374, the Court cannot say that no reasonable jury could find that the conduct to which Plaintiff was subjected created an hostile work environment. First, at least one incident involved physical intimidation. Second, there is testimony that supports that the conduct occurred frequently. Finally, there is the evidence concerning the remarks and conduct targeting members of other protected classes, which although it "may be of limited probative value, . . . cannot be ignored on summary judgment." *Schwapp v. Town of Avon*, 118 F.3d 106, 112 (2d Cir.1997). *See also Cruz*, 202 F.3d at 570 ("Because the crucial inquiry focuses on the nature of the workplace environment as a whole, a plaintiff who herself experiences discriminatory harassment need not be the target of other incidents of hostility in order for those incidents to support her claim."); *Boggs v. Die Fliedermaus, LLP*, 286 F. Supp. 2d 291, 298 (S.D.N.Y. 2003) ("abuse against various different groups -- such as both women and African Americans does not excuse behavior, but rather creates an overall hostile environment that exacerbates the effect of harassment experienced individually"); *see also Virola v. XO Commc'ns*, 2008 WL 1766601, at *18 & n.28 (E.D.N.Y. Apr. 15, 2008). While the evidence is far from overwhelming, it is sufficient to deny the motion for summary judgment.

Neither the fact that Caronia's testimony regarding the "guinea with no honor" incident may have differed in some respects from Plaintiff's, nor the fact that the testimony of some of the

employees identified by Plaintiff as witnesses to the verbal abuse do not support Plaintiff's claim, entitle Defendants to judgment. Rather, any such discrepancies raise credibility issues which are for a jury to decide.

Defendants' motion for summary judgment on Plaintiff's national origin claim is denied.

**C.**  **Standing to Assert Hostile Work Environment Claims**
**Based on Harassment of Others Who Belong to a Protected**
**Class of Which Plaintiff is Not a Member**

Defendants' have moved for summary judgment dismissing Ventimiglia's claims for hostile work environment based on sex and race. They maintain that under prudential standing standards Ventimiglia cannot assert hostile work environment claims based on the harassment of others who belong to a protected class of which he is not a member. It is therefore to the question of standing that the Court now turns.

"[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "The constitutional dimension of the standing doctrine originates from Article III of the Constitution, which confines federal courts to adjudicating 'cases' and 'controversies.' To meet the constitutional test for standing, '[a] plaintiff must allege injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Law Offices of Curtis V. Trinko, LLP v. Bell Atl. Corp.*, 305 F.3d 89, 97 (2d Cir. 2002), *rev'd on other grounds,* 540 U.S. 398 (2004) (brackets in original) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). Constitutional standing, however, is not at issue in this case. Rather, the issue is whether Ventimiglia satisfies the prudential requirements of standing.

### 1. Prudential Standing Generally

The requirements of prudential standing are judge-created limitations and "'foremost among the . . . requirements is the rule that a party must assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Id.* (quoting *Wight v. Bankamerica Corp.* 219 F.3d 79, 86 (2d Cir. 2000)). "'[T]he source of the plaintiff's claim to relief assumes critical importance with respect to the prudential rules of standing . . . . Essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief.'" *Id.* (quoting *Warth*, 422 U.S. at 500, and citing *Liebovitz v. New York City Transit Auth.*, 252 F.3d 179, 185 (2d Cir. 2001)). Another requirement of prudential standing is that "a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen v. Wright*, 468 U.S. 737, 751 (1984). *See also United States v. Rommy*, 506 F.3d 108, 130 (2d Cir. 2007) ( prudential standing may prevent "parties from asserting 1) the rights of someone not before the court, 2) generalized grievances, or 3) rights outside the 'zone of interest' protected by a given statutory or constitutional provision.") (citing *Warth*, 422 U.S. at 499).

### 2. Prudential Standing and Title VII

Neither the Supreme Court nor the Second Circuit has ruled on whether prudential standing limits standing under Title VII. In *Liebovitz v. New York City Transit Auth.*, 252 F.3d 179, 186 n.5 (2d Cir. 2001), the Second Circuit discussed at length, but did not ultimately decide, the issue.

In *Liebovitz*, the plaintiff's Title VII claims were threefold. First, she alleged she was

discriminated against because of her gender. Second, she alleged she was retaliated against for complaining of discrimination committed against other women. Third, she claimed she was subject to a hostile work environment because her employer was indifferent to discrimination against other women. A jury found against the plaintiff on the first and second claims but found for her on her hostile work environment claim. The district court denied the defendant's motion for judgment as to this third claim, holding that the plaintiff had standing to raise the hostile work environment claim though she was not personally a direct target of the alleged harassment and the employer appealed. The Second Circuit reversed but on the ground that the plaintiff had failed to prove her work environment was hostile.

The *Leibovitz* court began its standing discussion by addressing constitutional standing. It agreed with the district court that the plaintiff had constitutional standing because she alleged actual harm to herself as a result of "putatively illegal action." *Id.* at 184. "To reach the question of employer liability, the jury was required to find that Leibovitz was emotionally traumatized as a result of her workplace being permeated by sexual discrimination. We hold that this injury is sufficient to establish standing under Article III. . . . Leibovitz's alleged injury is distinct and palpable . . . . The fact that the injury to Leibovitz from working in a hostile environment may have been an indirect result of the harassment of other women does not necessarily preclude Article III standing." *Id.* at 184-85.

Although stating that it "did not believe that the facts of this case present an issue as to whether Congress intended prudential standing limitations to apply to Title VII," *id.* at 184, the *Leibovitz* court , nonetheless, went on to discuss prudential standing. The court began by framing the question as "'whether the . . . statutory provision on which the claim rests properly

16

can be understood as granting persons in the plaintiff's position a right to judicial relief.'" *Id*. at 185 (quoting *Warth*, 422 U.S. at 500.) It went on to note that "Title VII provides a private right of action for a 'person claiming to be aggrieved . . . by an alleged unlawful employment practice.' What it means to be 'aggrieved' is a question of standing, and questions of standing 'often turn on the nature and source of the claim asserted.'" *Id.* (brackets in original omitted) (citing 42 U.S.C. § 200e-5(f)(1) and *Warth*, 422 U.S. at 500).

Recognizing that a number of courts have denied standing to plaintiffs alleging injury because of third-party discrimination, the *Leibovitz* court found those cases distinguishable because those plaintiffs asserted Title VII rights on behalf of a protected class to which they did not belong. *Id.* at 186 (distinguishing *Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1180 (7th Cir. 1998) (white employees lacked standing to allege injury on behalf of black applicants who were discriminated against); *Childress v. City of Richmond*, 134 F.3d 1205, 1209 (4th Cir. 1998) (en banc) (Luttig, J. concurring) (white male plaintiffs asserting "only the rights of third-parties to be free from race or sex-based" employment discrimination did not state a claim under Title VII); *Patee v. Pacific Northwest Bell Tel.*, 803 F.3d 476, 478 (9th Cir. 1986) ("male workers cannot assert the right of their female co-workers to be free from discrimination based on their sex."). More analogous in the *Leibovitz* court's opinion was *Gray v. Greyhound Lines East*, 545 F.2d 169 (D.C. Cir. 1976) wherein the court held that African-American employees had standing to sue for racial discrimination against African Americans in hiring that did not affect them as applicants but impacted their treatment at work and went on to state that even if prudential standing limited standing for Title VII claims, it would reach the same result.

The *Leibovitz* court went on to reject the contention that Leibovitz's claim that other

women in her workplace were subject to a hostile work environment predicated injury on the violation of the rights of these other women as a mischaracterization of Leibovitz's claim:

> The district court . . . framed the question of liability in this case in terms of whether "evidence of sexual harassment of other women in [plaintiff's workplace] that caused her emotional distress . . . was sufficient to create an actionable claim for hostile work environment.' . . . The district judge thus understood the claim as one based on Leibovitz's own work environment, and charged the jury on that basis . . . . The verdict in favor of Leibovitz reflects the jury's conclusion that Leibovitz was injured because "her workplace was so permeated with discriminatory sexual behavior that was so severe or pervasive that it altered the conditions of her employment and created an abusive working environment for her."

252 F.3d at 187 (brackets in original).   Because Leibovitz's injury was not vicarious but rather resulted from her own work environment, which she experienced as hostile, the Second Circuit concluded that "prudential standing concerns of the kind cited by defendant are not present . . . . In any event, whether or not prudential concerns limit Title VII, we think that the better part of prudence is to avoid announcing a rule that forecloses as a matter of standing claims that allege actual injury to the plaintiff caused (as the jury found) by hostility in the workplace directed against members of the protected class to which plaintiff belongs." *Id.* at 188.  A determination as to prudential standing was unnecessary, given "Leibovitz - who was not herself a target of the alleged harassment while it was ongoing- failed to prove that an environment existed at work that was hostile to her because of her sex," *id.* at 190, thus rendering the other issues raised by the defendant employer purely academic.

a. The Parties' Arguments

Citing *Leibovitz* and decisions in other circuits, including *Bermudez, Childress* and *Patee*, Defendants argue that Ventimiglia "does not have 'prudential standing' to bring hostile work

18

environment claims based on protected classes of which he is not a member." (Defs'. Mem. in Supp. at 6.) In response, Ventimiglia proffers two arguments. First, he argues that he not only witnessed Chalom's harassment of Caronia, but "he was subjected to false accusations based upon Chalom's unfounded suspicions that he was having an affair with Caronia." Second, he argues that under the Second Circuit's decision in *Holcomb v. Iona College*, 521 F.3d 130 (2d Cir. 130 (2d Cir. 2008), he "may have a hostile work environment/discrimination claim based on what can fairly be characterized as Chalom's perception of his association with Caronia and/or Pratt." (Pl.'s Mem. in Opp. at 12.)

b. <u>Discussion</u>

Title VII confers the right to bring suit upon "a person claiming to be aggrieved . . . by any unlawful employment practice . . . ." *Id.* at § 2000e-5(f)(1)(A). The employment practices made unlawful by Title VII are:

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against *any individual* with respect to his compensation, terms, conditions, or privileges or employment, *because of such* individual's race, color, religion, sex or national origin; or
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee *because of such* individual's race, color, religion, sex or national origin.

42 U.S.C. 2000e-2(a) (emphasis added). That is to say, Title VII makes it unlawful, in the context of employment, to discriminate against anyone because of "such individual's" race, color religion, sex or national origin. Viewing the statute as a whole, prudential standing considerations support limiting "aggrieved persons" to those persons who are injured as a result

of discrimination directed at such individual's protected class. *See, e.g., Bermudez* and other cases cited *supra* at 17. In other words, "[a]n adverse reaction to observing someone else's injury," suffered by one who in not a member of the targeted protected class is insufficient for prudential standing. *See Bermudez*, 138 F.3d at 1180. *See generally Richardson v. New York State Dep't Correctional Serv.*, 180 F.3d 426, 436 (2d Cir. 1999) (focusing objective evaluation on "whether a reasonable person *who is the target of discrimination* would find the working conditions " sufficiently severe or pervasive) (emphasis added).

Such a limitation is consistent with *Leibovitz,* discussed *supra.* It is also consistent with the Second Circuit's recent decision in *Holcomb*, 521 F.3d 130.

In *Holcomb*, the Second Circuit held that an employer may violate Title VII if it takes action against an employee because of the employee's association with a person of another race. *Id.* at 132. In reaching this conclusion, the court tied the discrimination to the plaintiff's membership in a protected class. It reasoned that "where an employee is subjected to adverse action because an employer disapproves of interracial association, the employee suffers discrimination because of the employee's *own* race." *Id.* at 139 (emphasis in original).

But concluding that Ventimiglia cannot assert a sex-based hostile work environment claim because of Chalom's conduct towards Caronia or a race-based hostile work environment claim because of Chalom's conduct towards Pratt does not end the matter. Here, Ventimiglia is not asserting an injury solely caused by hostility in the workplace directed against members of a protected class to which the plaintiff did not belong, Ventimiglia asserts that his claims of sexual and racial harassment survive because he is complaining of conduct that was directed at him because of his sex and his race (and his association with members of the opposite sex and

another race) and not merely an adverse reaction to someone else's injury.

Turning first to the claim of sexual harassment, a jury could find that Ventimiglia was harassed because of his sex, male, and his association with Caronia, a female. For example, he states:

> Chalom was obsessed with [Caronia], and continually demanded that she engage in a relationship with him. Caronia refused these requests, and when she did so, Chalom accused her of having sex with other men in the dealership including me. . . . Chalom not only accused Caronia of having a sexual relationship with me, he also accused me in the same way and interrogated me as to whether I was in a relationship with her, which I was not, and always denied. . . . These discussions were embarrassing and offensive. Despite my denials of a relationship with Caronia, Chalom's accusation did not stop and this was extremely offensive to me.

Ventimiglia Aff. (Ex. 1 to Simon Aff.) at ¶¶ 8-10.

The above cited testimony makes evident Ventimiglia is not simply claiming an adverse reaction to someone else's injury. Rather, he is complaining of conduct directed at him. *Cf. Patane,* 508 F.3d at 114 ( "a plaintiff need only allege that she suffered a hostile work environment because of her gender, not that all of the offensive conduct was specifically aimed at her"); *Bermudez,* ( rejecting claim where it was "not that white women were harassed on account of their race, but that persons of any race or sex who were opposed to discrimination felt uncomfortable'). Accordingly, a jury could conclude that Ventimiglia was subject to a hostile work environment because of his sex. In other words, but for his sex, male, his relationship with his co-worker, female, construing all facts most favorably to him as the non-movant, would not have been an issue. Thus, at least arguably as in *Holcomb*, the treatment of which Ventimiglia complains was due, in part, to his membership in a protected class.

Ventimiglia's claim of a hostile work environment based on race, however, stands on a different footing. Ventimiglia makes only conclusory assertions that are insufficient to support a prima facie case. There is no evidence of conduct directed at him because of his race because of his association with Pratt or otherwise. Nor is there anything to suggest that his work environment was hostile based on his race. The gravamen of Chalom's concern about the relationship between Plaintiff and Pratt, on the evidence proffered, was limited to the belief that Pratt's loyalty was with Plaintiff supposedly to Chalom's detriment.

The motion for summary judgment is denied to the extent it seeks dismissal of Ventimiglia's claim of sex discrimination and granted as to his claim of race discrimination.

## III. Retaliation

### A. The Standard

Title VII "forbids an employer to retaliate against an employee for, inter alia, complaining of employment discrimination prohibited by Title VII." *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 205 (2d Cir. 2006) (citing 42 U.S.C. § 2000e-3(a)). Claims of retaliation pursuant to Title VII are analyzed according to the burden-shifting framework set forth in *McDonnell Douglas*. *See Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003).[5]

Under *McDonnell-Douglas* and its innumerable progeny, (1) a plaintiff must first establish a prima facie case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the

---

[5] Retaliation claims under the NYSHRL are generally governed by the same standards as federal claims under Title VII. *See Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006).

*McDonnell-Douglas* framework and its presumptions and burdens disappears, leaving the sole remaining issue of "discrimination vel non," and thus (3) the burden shifts back to the plaintiff to prove that the employer's stated reason is merely pretextual and that discrimination was an actual reason for the adverse employment action. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

"In order to present a prima facie case of retaliation under Title VII . . . , a plaintiff must adduce 'evidence sufficient to permit a rational trier of fact to find [1] that []he engaged in protected participation or opposition under Title VII, [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.'" *Id.* at 205-206 (brackets in original) (quoting *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)).

The burden of establishing a prima facie case has been described as "modest," *Viola,* 42 F.3d at 716, or even "minimal." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001). It is a burden of production, not persuasion, and involves no credibility assessments. *Reeves*, 530 U.S. at 143.

Likewise, the employer's burden of showing a legitimate non-discriminatory reason for its actions is not a particularly steep hurdle. It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory. *See Seils v. Rochester City Sch. Dist.*, 192 F. Supp. 2d 100, 111 (W.D.N.Y. 2002) (citing, *inter alia*, *Meiri*,

759 F.2d at 995 (2d Cir. 1985)), *aff'd*, 99 Fed. Appx. 350 (2d Cir. 2004). Federal courts do not

have a "roving commission to review business judgments," *Mont. v. First Fed. Sav. & Loan*

*Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989) (quoting *Graefenhain v. Pabst Brewing*

*Co.*, 827 F.2d 13, 21 n.8 (7th Cir. 1987)), and may not "sit as super personnel departments,

assessing the merits — or even the rationality — of employers' non-discriminatory business

decisions." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991). Thus, "[e]vidence

that an employer made a poor business judgment generally is insufficient to establish a question

of fact as to the credibility of the employer's reasons." *Dister v. Continental Group, Inc.*, 859

F.2d 1108, 1116 (2d Cir. 1988).

In order to demonstrate that the employer's stated non-discriminatory reasons for the

allegedly discriminatory action are pretextual, "[a] plaintiff is not required to show that the

employer's proffered reasons were false or played no role in the employment decision, but only

that they were not the only reasons and that the prohibited factor was at least one of the

motivating factors." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995). A

discrimination claimant may show pretext by demonstrating "such weaknesses, implausibilities,

inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons

for its action that a reasonable factfinder could rationally find them unworthy of credence and

hence infer that the employer did not act for the asserted non-discriminatory reasons." *Bombero*

*v. Warner-Lambert Co.*, 142 F. Supp. 2d 196, 203 n.7 (D. Conn. 2000) (quoting *Anderson v.*

*Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999), and citing *Olson v. Gen. Elec.*

*Astrospace*, 101 F.3d 947, 951-52 (3d Cir. 1996)), *aff'd*, 9 Fed. Appx. 38 (2d Cir. 2001).

However, to rebut an employer's proffered non-discriminatory rationale for its actions

and withstand summary judgment, a plaintiff must present more than allegations that are "conclusory and unsupported by evidence of any weight." *Smith v. Am. Exp. Co.*, 853 F.2d 151, 154-55 (2d Cir. 1988). "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all [discrimination] cases." *Meiri*, 759 F.2d at 998.

With these standards in mind, the court shall proceed to address Ventimiglia's retaliation claim.

**B.      Material Issues of Fact Exist as to Plaintiff's Retaliation Claim**

In their motion for summary judgment on Plaintiff's retaliation claims, Defendants maintain that Plaintiff did not engage in protected activity and cannot show either an adverse employment action or a causal connection between the alleged protected activity and the alleged adverse employment action.

The first element of the prima facie standard requires that Ventimiglia have taken "action . . . to protest or oppose statutorily prohibited discrimination. *Cruz*, 202 F.3d at 566; *see Taylor v. Family Residences & Essential Enterprises, Inc.*, 2008 WL 268801, at *13 (E.D.N.Y. Jan. 30, 2008). This includes, for example "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges." *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990; *see Cruz,* 202 F.3d at 566. Indeed, Title VII's protection against retaliation extends to an employee who speaks out about discrimination not on her own initiative, but in answering questions during an employer's internal investigation "if for no other reason than . . . '[w]hen an

employee communicates to her employer a belief that the employer has engaged in a form of employment discrimination, that communication 'virtually always' constitutes the employee's opposition to the activity.'" *Crawford v. Metro. Gov't of Nashville and Davidson County Tennessee*, 129 S. Ct. 846, 851 (2009) (ellipses in original omitted).  In order to satisfy this prong of a retaliation claim, the plaintiff need only have a good faith reasonable belief that he was opposing an employment practice made unlawful by Title VII." *Kessler,* 461 F.3d at 210; *see Everson v. New York City Transit Auth.*, 2007 WL 539159, *27  (E.D.N.Y. Feb. 16, 2007) ("protected activity . . . refers to any action taken to oppose statutorily prohibited discrimination").  Additionally, "in satisfying the knowledge requirement, only general corporate knowledge that the plaintiff engaged in a protected activity is necessary." *Id.*

Defendants' argument that Plaintiff did not engage in protected activity is premised on their claim that Plaintiff's discussions with Chalom regarding Chalom's behavior towards Caronia in general and his conversation regarding a sexual harassment seminar held at the dealership in particular, evidence an intent to protect the company from a lawsuit rather than protect Caronia from unlawful discrimination.  However, viewing the evidence in the light most favorable to Plaintiff, as the Court must, there is sufficient evidence that Ventimiglia engaged in protected activity.  First, Ventimiglia's informal complaints and statements to Chalom regarding his conduct towards Caronia and other women are sufficient to meet the protected activity prong of his retaliation claim.  *See Lamberson v. Six West Retail Acquisition Inc.,* 122 F. Supp. 2d 502, 511 (S.D.N.Y. 2000) ("Protected oppositional activities include informal as well as formal complaints and complaints to management").  Second, a jury could find that Ventimiglia's conversations with Chalom regarding the seminar constitute protected activity.  That Ventimiglia

may have phrased his opposition to the discriminatory conduct as rooted in its potential effect on the dealership rather than on Caronia does not necessarily make it any less of an opposition. *Cf. Crawford*, 129 S. Ct. at 851 (Title VII's protection against retaliation extends to an employee who speaks out about discrimination not on her own initiative, but in answering questions during an employer's internal investigation "if for no other reason than . . . '[w]hen an employee communicates to her employer a belief that the employer has engaged in a form of employment discrimination, that communication ' virtually always 'constitutes the employee's opposition to the activity.'") (ellipses in original omitted).

Moreover, there is a question of fact whether Plaintiff suffered an adverse employment action. As set forth in his affidavit, Ventimiglia avers that Chalom first fired him without giving him a reason, then offered him a job as sales manager at one third the pay he received as general manager. (Ventimgilia Aff. at ¶3). Defendants' reliance on the testimony of another employee that Chalom did not discuss a reduction in pay and that Chalom informed Plaintiff, not of his termination or demotion, but that another person was going to "join" Plaintiff as general manager does not entitled them to summary judgment. It merely creates an issue of fact for the jury to decide.

Turning then to Defendants' argument that Plaintiff cannot show a causal link between the alleged protected activity and the alleged adverse employment action, the Court finds it unpersuasive. Defendants maintain that the allegation in the complaint that Plaintiff was constructively discharged "as a result of Chalom's false accusations of an affair between Ventimiglia and Caronia" is inconsistent with the allegation that he was constructively discharged "in retaliation" for his opposition to discrimination. According to Defendants,

Plaintiff's purported concession of a "non-discriminatory" reason for the discharge, i.e. false accusations of an affair with Caronia, dispels any inference of causation.  Here, however, the allegation that Plaintiff was discharged as a result of the false accusation of an affair between plaintiff and Caronia is not necessarily a non-discriminatory reason as that accusation is part of the alleged sexually hostile work environment to which Ventimiglia was subjected.  *See* discussion *supra.*

Defendants' final argument is that even if Plaintiff can establish a prima facie case of retaliation, the claim must fail because the employment action – making an individual co-general manager with Plaintiff – was for a legitimate nondiscriminatory reason, i.e. to address a deficiency in Plaintiff's performance.   According to Defendants, Ventimiglia would approve sales prices that did not include after sale items, requiring the finance department "to then 'pump' the customer on the established price to one that includes after sale items," making it difficult for deals to be consummated.  (Def. Mem in Supp. at 27.)  The addition of the "co" general manager was based on a need to remedy Plaintiff's deficiency of quickly approving vehicle prices that required additional work by the finance department.  (*See id.*)

However,  Plaintiff points to evidence that Defendants failed to observe their own written personal policies in handling this alleged deficiency, thus creating an issue as to whether this allegedly deficiency is mere pretext.  Moreover, the question of pretext is raised by Chalom's testimony that he had suspicions that Ventimiglia had had something to do with a female employee bringing a sexual harassment claim prior to Caronia's.  (Chalom Dep. at 58-60.)

The motion for summary judgment on Plaintiff's retaliation claim is denied.

**V.  Defendants' Are Granted Summary Judgment on the Defamation Claim.**

Under New York Law, in order to establish a defamation claim, a plaintiff must prove 1) a defamatory statement of fact, 2) regarding the plaintiff, 3) published to a third party, 4) by the defendant, 4) with injury to the plaintiff.  *See, e. g. Boyd v. Nationwide Mutual Ins. Co.,* 208 F.3d 406, 409  (2d Cir. 2000).

Plaintiff's defamation cause of action is premised on the allegation that Chalom publicly accused Plaintiff of embezzling money from Chevrolet Inc.  Defendants'  have moved for judgment on Plaintiff's defamation claim pointing to the absence of evidence that the defamatory statement was made.  In response, Plaintiff has not put forth admissible evidence that any such alleged statement was made.  Rather Plaintiff points to his deposition testimony wherein he testified that he was told by a number of people that Chalom accused Plaintiff of stealing from him.  Plaintiff also avers in his affidavit that at least three people confirmed to him that Chalom made such an accusation.  This testimony, however, is based on hearsay and does not provide admissible evidence of the alleged defamatory statement.  *See Grennan v. Nassau County*, 2007 WL 952067, at * 19-20 (E.D.N.Y. Mar. 29, 2007 (granting defendant summary judgment on defamation claim as plaintiff's affidavit did not provide admissible evidence of defamatory statement where she had no personal knowledge of statement but relied solely on hearsay); s*ee also H. Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 454-55 (2d Cir. 1991) (instructing that hearsay assertion that would not be admissible if testified to at trial is not competent material for a Rule 56 affidavit); *see also Sarno,* 183 F.3d at 160 ("Rule 56 provides that an affidavit submitted in opposition to summary judgment 'shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant

is competent to testify to the matters stated therein.'") (quoting Fed. R. Civ. P. 56(e)).

Accordingly, Defendants' motion for summary judgment on the defamation claim is granted.

## VI. The Claims against Hustedt Chevrolet, Hustedt Hyundai, and Hustedt Hyundai, Inc. Are Dismissed

The claims against Hustedt Chevrolet, Hustedt Hyundai, and Hustedt Hyundai, Inc. are dismissed. It is undisputed in this case that Plaintiff was employed by Chevrolet Inc. during the time period at issue. The existence of an employer-employee relationship is a primary element of Title VII claims." *Gulino v. New York State Educ. Dep't*, 460 F.3d 361, 370 (2d Cir. 2006). As there was no employer-employer relationship between Plaintiff and any of these three entities, the claims against Hustedt Chevrolet, Hustedt Hyundai, and Hustedt Hyundai, Inc. are dismissed.

### Conclusion

For the reasons set forth above, Defendants' motion for summary judgment is granted as to (1) the defamation claim; and (2) the hostile work environment claim based on race; but is otherwise denied. The claims against Hustedt Chevrolet, Hustedt Hyundai and Hustedt Hyundai, Inc. are dismissed.

**SO ORDERED.**

Dated: Central Islip, New York
March 25, 2009

/s/_____
Denis R. Hurley
Senior District Judge